# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# COOKEVILLE DIVISION

| | |
|---|---|
| RODNEY SHOAP, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   NO. 2:16-cv-00115 |
| | )   CHIEF JUDGE CRENSHAW |
| CITY OF CROSSVILLE and | ) |
| JESSE KERLEY, | ) |
| | ) |
|    Defendants. | ) |

## MEMORANDUM OPINION

Rodney Shoap ("Shoap") brought this action against the City of Crossville ("Crossville") and Jesse Kerley ("Kerley"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); the Age Discrimination in Employment Act of 1968 ("ADEA"); the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, et seq.; the Tennessee Public Protection Act, Tenn. Code Ann. §50-1-304, et seq.; and Tennessee state laws of contract and tort, arising from Shoap's tenure in and departure from the Crossville Police Department. Shoap brings federal and state claims against Crossville and state claims against Kerley. Crossville and Kerley have each filed Motions for Summary Judgment. (Doc. Nos. 31, 36.) Shoap has responded (Doc. Nos. 42, 47) and Crossville and Kerley have filed replies (Doc. Nos. 45, 51). For the following reasons, Crossville's motion will be granted in part and the Court will decline to exercise supplemental jurisdiction over remaining state law claims.

I. <u>Facts</u>[1]

Shoap had a long career in law enforcement. Under the Crossville City Charter, only the City Manager had the power to hire and fire Shoap. (Doc. No. 49 at ¶ 10.) In January 2015, Shoap was hired to be the interim Police Chief of Crossville for a period not to exceed 18 months, reporting to City Manager David Rutherford. (<u>Id</u>. at ¶¶ 1-2.) Shoap's relationship with Rutherford was "good." (<u>Id</u>. at ¶ 3.) Shoap understood that he worked for the City Manager and "not for the City Council or any City Council member at all times during his employment." (<u>Id</u>. at ¶ 7.) According to Shoap, he was under the supervision of the City Manager "every day" that he was an employee of Crossville. (Doc. No. 33-1 at 26.)

In August 2015, Kerley, a Crossville Councilman, asked Shoap to investigate a report that a child had been inappropriately touched by another child in the cafeteria of one of the local schools. (<u>Id</u>. at 15.) Shoap has testified that there was "nothing wrong" about Kerley, or anyone, bringing this to his attention, even if a later investigation revealed that no crime was committed. (<u>Id</u>. at 16, 18; Doc. No. 49 at ¶¶ 11, 13.) Shoap never had an issue with Kerley before this incident. (Doc. No. 33-1 at 20.) Shoap did not have another interaction with Kerley until February 2016. (<u>Id</u>.) So from the beginning of his time as interim Police Chief in January 2015 through February 2016, Shoap had only one incident with Kerley. (<u>Id</u>. at 21.) During that same time, Shoap had "no" incident with "any other employee or leader with the City of Crossville." (<u>Id</u>.) In fact, during his

---

[1] Shoap includes a factual narrative in his summary judgment response brief (Doc. No. 48 at 1-4), supported in part by self-serving affidavits, that aver numerous facts that he failed to set forth in his response to Crossville's Statement of Undisputed Facts or his own Statement of Additional Facts, many of which concern irrelevant matters or events that occurred after Shoap resigned his position. The Court, however, only discusses the material facts necessary for disposition of Shoap's federal claims. Events that occurred after Shoap resigned are not relevant in this regard.

deposition, Shoap testified that he "couldn't think of any" incidents with "anyone from the City of Crossville besides Mr. Kerley." (Id.)

In March 2016, Rutherford indicated that he wished to hire Shoap on a permanent basis. However, his status remained as "employment at-will and not a contract." (Doc. No. 42-2 at 3.) As part of his employment, Shoap certified that he received a copy of the personnel rules and regulations of Crossville, that Crossville was an at-will employer, and that he could be "discharged at any time with or without right of appeal." (Doc. No. 33-2 at 6.) In April 2016, Rutherford was terminated before he could "finalize the paperwork," as he had intended, on July 28, 2016. (Doc. Nos. 42-2 at 3; 33-1 at 47.) Thus, when asked during his deposition "so [Rutherford] never did get you hired as permanent police chief, because he was terminated, correct?" Shoap replied, "[t]hat's correct."[2] (Doc. No. 33-1 at 48.)

Rutherford was replaced as City Manager by Steve Hill. Shoap's relationship with Hill was "good." (Doc. No. 49 at ¶ 4.)[3] Around this time, Shoap had a second encounter with Kerley. Kerley complained to Shoap that another Crossville Councilman had assaulted him. (Doc. No. 33-1 at 37.) Again, Shoap testified that it was "entirely appropriate" for Kerley to report what he believed

---

[2] Shoap has adduced testimony of (1) Rutherford that he "believes" that he was fired because he supported Shoap for the permanent position and (2) City Clerk Oglesby that she "think[s]" one of the reasons Rutherford was fired was a concern that he was going to hire Shoap. (Doc. No. 52 at ¶ 1; 42-2; 42-3.) The firing of Rutherford is of no relevance to the dispositive legal issues in this case. Moreover, these opinions are mere supposition about the motivations of individual City Councilmembers; they do not material establish facts.

[3] In his deposition, Shoap expressed dissatisfaction with Hill because Hill told Shoap that he was going to supervise him for one month before making a recommendation as to permanent hiring, but then told the Council that he was going to supervise Shoap for two months. (Doc. No. 33-1 at 22-23.) Shoap acknowledged, however, that as City Manager, his supervisor, and the hiring authority, Hill was entitled to supervise Shoap for as long as he wanted. (Id. at 23-26.) Shoap also complained that Hill refused to pay for him to attend a conference in late July 2016, but then acknowledged that it overlapped with the end of his employment term. (Id. at 29.)

to be a crime, and for Shoap to investigate it. (Id. at 39; Doc. No. 49 at ¶ 16.) Kerley "demanded" that Shoap write an assault complaint, but, after investigation, Shoap determined that doing so was not appropriate. (Doc. No. 33-1 at 37-39.) Shoap explained that this was "how the system is supposed to work." (Id. at 39.) Kerley objected to Shoap's conclusions. (Id. at 39-41.) Shoap went to Kerley's house, and asked Hill to accompany him. (Id. at 41.) Kerley complained that Shoap "wouldn't write an assault complaint for him." (Id. at 42.) Shoap felt that Hill did not intercede in the meeting to protect him from Kerley's statements. (Id. at 32.)

Hill initially told Shoap that he would decide on his permanent hiring within a month, but it was stretched to several months, and then to possibly after the election. (Id. at 45-46.) As time went on, Shoap became tired of waiting for Hill to make a decision to hire him. (Doc. No. 49 at ¶ 19.) He was tired of "excuse after excuse." (Id. at ¶ 20) He was angered by Hill's "putting him off." (Doc. No. 33-1 at 45.) Shoap was also upset that on two occasions Hill had said he would hire Shoap if there was enough support from City Council members, but then would not immediately call the Council members to "poll" them in Shoap's presence. (Id. at 33-34.)

Major Mark Rosser was second in command in the Crossville Police Department. (Doc. No. 49 at ¶ 5.) Rosser was a good officer about whom Shoap had no complaints. (Id. at ¶ 6.) On June 30, 2016, Shoap encountered Rosser coming out of Hill's office and, according to Shoap, Rosser and Hill gave him a "real funny look, surprised look." (Doc. No. 33-1 at 30.) Soon thereafter, Rosser told Shoap that he had intended to support Shoap's candidacy, but had asked Hill to hire him if Rosser did not hire Shoap. (Id.) Rosser told Shoap that he and Hill discussed permanent employment with a contract. (Id.) Shoap testified that this caused him "a little consternation." (Id. at 31.) Shoap tried to talk Rosser out of applying for the job on the ground that that it would potentially do harm to Rosser's retirement benefits. (Id.)

Later that day, Shoap resigned. Shoap made statements the same day, reported in an article on www.crossville-chronicle.com by Gary Nelson, entitled "Interim police chief resigns, 'Tired of waiting,'" to the effect that Shoap had grown tired of the City Manager and the delay in the decision to hire him. (Doc. Nos. 33-1 at 44, 49; 33-2 at 7-8.) Prior to the resignation, Hill did not fire Shoap or say he was going to fire Shoap. (Doc. No. 49 at ¶ 15.) Shoap has filed an Affidavit stating that the conditions were "so intolerable" for him as of June 30, 2016, that he could not continue working. (Doc. No. 42-1 at ¶ 13.)

Shoap did not utilize any grievance or appeal mechanisms that Crossville provides to resolve employee dissatisfaction. (Id. at ¶ 24.) Shoap also did not make any written complaint to Crossville. (Id. at ¶ 25.) Shoap was not subjected to discipline by Crossville at any time. (Id. at ¶ 30.)

II.  Legal Standard

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). After the movant has satisfied this initial burden, the nonmoving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue

for trial.'" Matsushita, 475 U.S. at 587. If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson, 477 U.S. at 479-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49).

III. Analysis

    A. Title VII Claims Against Crossville

        1. Adverse Action Discrimination Claim

Title VII provides that "it shall be an unlawful employment practice for an employer" to discriminate on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). In his EEOC Charge, Shoap alleges that he was discriminated against on the basis of age, religion, and sex. (Doc. No. 36-9.) However, the Complaint only pursued claims of discrimination based age and religion. (Doc. No. 1.) Under the circumstantial evidence approach, the Court employs the familiar McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Loyd v. St. Joseph Mercy Oakland, 766 F.3d 580, 589 (6th Cir. 2014); Tenn. Code Ann. § 4–21–311(e) (abrogating Gossett v. Tractor Supply Co., 320 S.W.3d 777, 779 (Tenn. 2010) and requiring the continued application of the burden-shifting framework in THRA cases in accordance with prior state common law). Under that approach, Shoap first has the burden of stating a prima facie case of discrimination by establishing, by a preponderance of the evidence, that: (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position he held; and (4) he was replaced by someone outside of his protected class or treated differently from similarly situated, non-protected employees. Id.

6

Here, Shoap fails to make a prima facie case because there was no adverse employment action. Shoap was not terminated, but rather resigned of his own free will. Shoap instead argues that he was "constructively discharged." This is "a tough road to hoe." Groening v. Glen Lake Cmty. Schs., 884 F.3d 626, 630 (6th Cir. 2018). To establish a constructive discharge, Shoap must present evidence showing 1) that Crossville "deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and 2) [Crossville] did so 'with the intention of forcing [him] to quit. . . . '" Logan v. Denny's, Inc., 259 F.3d 558, 568-69 (6th Cir. 2001) (quoting Moore v. KUKA Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999)); Johnson v. Donohoe, 642 F. App'x 599, 613 (6th Cir. 2016) (same). In other words, the employer must have created an intolerable working environment for the specific purpose of making the employee quit. Groening, 884 F.3d at 629. The Sixth Circuit instructs that in making this determination the Court is to consider whether there was a:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Logan, 259 F.3d at 569 (citing Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000)); Johnson, 642 F. App'x at 613. "[A]n employer's criticism of an employee does not amount to constructive discharge – especially when the employer's criticism is limited to a few isolated incidents." Groening, 884 F.3d at 631 (citing Savage v. Gee, 665 F.3d 732, 739 (6th Cir. 2012) and Smith v. Henderson, 376 F.3d 529, 534 (6th Cir. 2004)); see also Cleveland v. S. Disposal Waste Connections, 491 F. App'x 698, 708 (6th Cir. 2012) (disparaging comments isolated to only a few incidents and by a few individuals do not alter working conditions).

7

Shoap has introduced no competent evidence that Rutherford or Hill created intolerable working conditions for him, *nor* that Crossville was attempting to force him to quit.[4] Shoap resigned minutes after finding out Rosser was also under consideration for the permanent Police Chief position. Shoap can only point to minor hassles, delays with the decision-making process for the permanent position, and several incidents with Kerley, who was not Shoap's supervisor/employer. Indeed, Shoap explicitly testified that for the vast majority of his employment he had *no* problems with *anyone* who worked for Crossville except Kerley. (Doc. No. 33-1 at 21.) And, importantly, even Shoap's various complaints about Kerley do not indicate that Kerley was trying to get Shoap *to quit*, but, rather, that Kerley was trying to get Shoap to *do his job in a certain way* and comply with Kerley's wishes (e.g., to investigate certain alleged crimes and to write an "assault" report). Finally, *none* of the seven tell-tale scenarios described by the Sixth Circuit occurred here; the day Shoap resigned he was in the same stead as the day he started.

The law of constructive discharge does not guarantee an "ideal" workplace or one free from pressure to perform, but rather prevents the intentional targeting of an employee to quit due to objectively intolerable conditions. Shoap's self-serving affidavit that he "determined" that the conditions were intolerable is not sufficient to raise a question of fact as to constructive discharge, as the standard is objective, not subjective. Shoap's personal feelings towards Kerley aside, no reasonable jury could find that Shoap's working conditions were objectively intolerable. Put simply, the conditions for which Shoap has put forth evidence do not come close to meeting the standard for constructive discharge. See, e.g., Groening, 884 F.3d at 630-31 (rejecting claim of

---

[4] It is not even logical that Crossville would "intend" for Shoap to quit in June 2016, as (1) Shoap was an at-will employee who could be easily replaced at any time and (2) Shoap's 18-month tenure as interim Police Chief would expire by its terms at the end of July 2016 if he was not formally hired by Hill.

constructive discharge where plaintiff resigned after employer allegedly subjected her to "months of hostility," complained she was not doing her job, and spearheaded an audit designed to accuse her of wrongdoing).

Accordingly, Crossville is entitled to summary judgment on Shoap's Title VII discrimination claim.

2. Hostile Work Environment Claim

Under Title VII, a plaintiff is subjected to a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule or insult sufficiently severe or pervasive to alter the conditions of employment." Waldo v. Consumers Energy Co., 726 F.3d 802, 813 (6th Cir. 2013) (quoting Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 333 (6th Cir. 2008)); Johnson, 642 F. App'x at 611 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-67 (1986)). In order to succeed on a Title VII hostile work environment claim, a plaintiff must demonstrate that: (1) he belonged to a protected group, (2) he was subject to unwelcome harassment, (3) the harassment was based on [his protected status], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act. Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th Cir. 2011). In deciding whether harassment is "sufficiently severe or pervasive," the Sixth Circuit instructs the Court to consider factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 512 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). Critically, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Barrett v. Whirlpool Corp.,

556 F.3d 502, 515 (6th Cir. 2009) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)) (alterations in original) (internal quotation marks omitted); see also Knox v. Neaton Auto Prods. Mfg., Inc., 375 F.3d 451, 459060 (6th Cir. 2004) (noting that crass and offensive behavior may not be enough to trigger liability if it does not unreasonably interfere with an employee's performance). Moreover, to state a claim for constructive discharge based on a hostile work environment, a plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Johnson, 642 F. App'x at 613 (quoting Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004)). Finally, a "basic tenet" of this cause of action is that it is reviewed by the court based on the totality of the circumstances, such that a court must consider the work environment as a whole and all the alleged incidents of harassment by all perpetrators for their cumulative effect. Williams v. Gen. Motors Corp., 187 F.3d 553, 562-63 (6th Cir. 1999).

In the Complaint, Shoap only alleges that he was harassed by Kerley. (Doc. No. 1.) Shoap relies primarily on two incidents over the course of fifteen months – the disagreements with Kerley about the child abuse report and Kerley's complaint of assault by another Councilman. The Complaint also mentions several alleged derogatory statements made by Kerley about "old men", and one derogatory text sent by Kerley about Shoap's Christian faith, even though evidence of these was completely absent from Shoap's Statement of Facts. Even assuming, *arguendo*, that all of these events occurred, Shoap falls far short of establishing a question of fact as to whether the totality of Kerley's conduct was "severe or pervasive" enough to alter the conditions of Shoap's employment. These events were infrequent in the overall course of Shoap's employment, not severe, and were not physically threatening or humiliating. Compare with Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 734 (6th Cir. 2006) (finding plaintiff's burden satisfied as to claim

of hostile work environment where there was evidence of daily verbal harassment and multiple physical attacks that together were "clearly traumatic"); Cossairt v. Jarrett Builders, Inc., 292 F. Supp. 3d 779, 787 (M.D. Tenn. 2018) (denying summary judgment where plaintiff encountered volume of "repeated sexual comments, innuendos, and overtures" that "buil[t] up over time," were led by her own supervisor, made her feel like a "mascot," and caused problems that continued after leaving employment). Importantly, Shoap has introduced no evidence that the conditions of his work environment unreasonably interfered with his work performance. Indeed, Shoap testified that Kerley absolutely had the right to advocate for himself and to publicly disagree with Shoap, and that Shoap stuck to his guns and performed his job properly. At most, Shoap has offered evidence of Kerley being politically vindictive, obnoxious, or prone to occasional offensive utterances, but not of a workplace "permeated with discriminatory intimidation" that "compelled" Shoap to resign. Crossville is therefore entitled to summary judgment on Shoap's Title VII hostile work environment claim.

B. ADEA Claims Against Crossville

1. Discrimination Claim

The ADEA forbids an employer "to discharge . . . or otherwise discriminate against any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Discharged employees may prove a violation of the ADEA using the McDonnell Douglas burden-shifting framework. Pierson v. Quad/Graphics Printing Corp., 749 F.3d 530, 536 (6th Cir. 2014). Under this framework, the employee first has the burden of proving a prima facie case. To do so, an employee must demonstrate that "(1) he or she was a member of a protected age class (i.e., at least forty years old); (2) he or she suffered an adverse employment action; (3) he or she was qualified for the job

or promotion; and (4) the employer gave the job to a younger employee." Blair v. Henry Filters, Inc., 505 F.3d 517, 529 (6th Cir. 2007).

As discussed above, (1) there was no adverse employment action here and (2) Shoap has not established a question of fact as to whether he was constructively discharged. Crossville is therefore entitled to summary judgment on Shoap's ADEA discrimination claim.

### 2. Retaliation Claim

Shoap also raises an ADEA retaliation claim. In order to state a claim of retaliation under the ADEA, a plaintiff must show that: (1) he engaged in protected activity; (2) the defendant had knowledge of his protected conduct; (3) the defendant took an adverse employment action towards him; and (4) there was a causal connection between the protected activity and the adverse employment action. Weigel v. Baptist Hosp. of East Tenn., 302 F.3d 367, 381 (6th Cir. 2002).

The Court is doubtful as to whether Shoap engaged in a protected activity. The Sixth Circuit has held that "an employee need not file a formal EEOC complaint to engage in protected activity – rather 'it is the assertion of statutory rights' that triggers protection under the ADEA's anti-retaliation provision."[5] Fox v. Eagle Distrib. Co., Inc., 510 F.3d 587, 591 (6th Cir. 2007) (citing EEOC v. Romeo Cmty. Schs., 976 F.2d 985, 989 (6th Cir. 1992)). As a result, an ADEA retaliation claim can also apply to "the unofficial assertion [of] rights through complaints at work." Romeo Cmty. Schs., 976 F.2d at 989. Here, Shoap did not make any written complaint or file any grievance with Crossville asserting any rights relevant to the ADEA. (Doc. No. 49 at ¶¶ 25-26.) Shoap has also not pointed to any evidence that he made any informal complaint of discrimination to his supervisors/employers (Rutherford or Hill), or to Crossville's Human Resources Department, concerning any allegation of discrimination. All that Shoap's evidence suggests is

---

[5] Shoap did not check the box for "retaliation" in his EEOC Charge. (Doc. No. 36-9.)

that he voiced general (if fervent) objection to Kerley. But "a complaint must allege unlawful discrimination rather than general unfairness." Mumm v. Charter Twp. of Superior, 727 F. App'x 110, 112 (6th Cir. 2018). And while a complaint need not be "lodged with absolute formality, clarity, or precision," Yazdian v. ConMed Endoscopic Techs., Inc., 793 F.3d 634, 645 (6th Cir. 2015), "a vague charge of discrimination . . . is insufficient to constitute opposition to an unlawful employment practice," Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1312–13 (6th Cir. 1989).

In the end it does not matter, because this claim fails even if there were a protected activity. As discussed above, (1) there was no adverse employment action here and (2) Shoap has not established a question of fact as to whether he was constructively discharged. Crossville is therefore entitled to summary judgment on Shoap's ADEA retaliation claim.

    C.    State Law Claims Against Crossville and Kerley

The Court may decline to exercise supplemental jurisdiction over a state law claim if it dismisses "all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" Gamel v. City of Cincinnati, 625 F.3d 949, 951 (6th Cir. 2010) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims . . . ." Id. at 952 (quoting Musson Theatrical, Inc. v. Fed. Exp. Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996)). Shoap's state law claims against Crossville and Kerley are of the type that that Tennessee courts routinely and skillfully consider. Moreover, they involve considerations of the actions of a local police chief, local city managers, and local city councilmen. Fairness and comity dictate that the

Tennessee courts should be given the opportunity to decide these claims. After weighing the relevant factors, the Court does not find any reason to depart from the general rule, and therefore declines to retain supplemental jurisdiction over Shoap's state law claims against Crossville and Kerley.

IV. Conclusion

Crossville's Motion for Summary Judgment (Doc. No. 31) will be granted in part as to Shoap's Title VII and ADEA claims against Crossville and denied as moot in part as to the remaining state claims over which the Court declines to exercise supplemental jurisdiction. Kerley's Motion for Summary Judgment (Doc. No. 36) as to state law claims will likewise be denied as moot. Accordingly, Shoap's federal claims against Crossville will be dismissed with prejudice and state law claims against Crossville and Kerley will be dismissed without prejudice. The case will be closed.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE